IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SIEMATIC MOBELWERKE GMBH & CO.KG | : | |
| Plaintiff, | : | |
| v. | : | 06-CV-5165 |
| | : | |
| SIEMATIC CORPORATION, SIEMATIC DESIGN STUDIOS, LLC FRANK W. SIEKMANN, | : | |
| Defendants. | : | |
| SIEMATIC CORPORATION and FRANK SIEKMANN, | : | |
| Counterclaim-Plaintiffs, | : | |
| v. | : | |
| SIEMATIC MOBELWERKE GMBH & CO KG, and ULRICH SIEKMANN | : | |
| Counterclaim-Defendants. | : | |

**MEMORANDUM**

**I. Background**[1]

Plaintiff SieMatic Möbelwerke GmbH & Co. KG ("SM Germany") is a German corporation that manufacturers, markets, and sells kitchen cabinetry throughout the world. Defendant SieMatic Corporation ("SMC") is a Georgia corporation with its principal place of business in Pennsylvania. Defendant Frank Siekmann is the Chief Executive Officer of SMC, and a resident of Pennsylvania.[2] Both SMC and SM Germany were owned and controlled by August-Wilhelm Siekmann ("AW Siekmann") until the early or mid-1990s, at which point AW

---

[1] Unless otherwise noted, all facts are taken from the Defendants' Second Amended Answer, Affirmative Defenses, and Counterclaims and are considered in the light most favorable to SieMatic Corporation, the non-moving party.

[2] Jurisdiction in this case is proper under 28 U.S.C. § 1332(a)(2).

Siekmann transferred ownership of SMC to his son, defendant Frank Siekmann, and ownership of SM Germany to his other son, third-party defendant Ulrich Siekmann. SM Germany and SMC thus became two divisions of a family business that were separately owned by half-brothers Ulrich Siekmann and Frank Siekmann, respectively. Because of the longstanding relationship between SM Germany and SMC, SMC placed special trust in SM Germany and Ulrich Siekmann, and believed that SM Germany and Ulrich Siekmann would act in SMC's best interests in their future business dealings.

On April 1, 2003, AW Siekmann executed an agreement in which he granted Frank Siekmann a license (the "License") to use the SieMatic name in connection with the sale of products manufactured by SieMatic Germany in a territory including North and South America (the "2003 Licensing Agreement").[3] In the same agreement, AW Siekmann granted his other children, Ulrich Siekmann and Kathrin André, a license to use the SieMatic name in Europe and most of the rest of the world.

The complaint alleges that by 2004, SMC was having substantial financial difficulties. In June 2004, SM Germany made a loan to SMC in the amount of € 800,000 (approximately $1,250,000.00 in U.S. dollars, based on 2008 exchange rates) (the "2004 Loan Agreement"). Despite this infusion of capital, SMC continued to struggle financially.

SMC alleges that it was dependent on SM Germany for product shipments at this time, and that SM Germany knew that it had financial and functional dominance over SMC. In April 2005, in an attempt to salvage its business, SMC entered into discussions with SM Germany

---

[3] It is unclear from the pleadings, but AW Siekmann apparently retained the license to the SieMatic name after transferring ownership of the SieMatic businesses to his sons.

which resulted in the execution of an agreement whereby SMC agreed to act as SM Germany's sales agent in soliciting sales of its products in North and South America (the "2005 Sales Agency Agreement").  SMC alleges that it would have "preferred not to" have signed that agreement, but was pressured into it by SM Germany.  According to SMC, the 2005 Sales Agency Agreement was an instrument requested by SM Germany to avoid successor liability in the event that creditors of SMC attempted to pursue SM Germany after SM Germany took over SMC's remaining business.  At this time, SM Germany and SMC were discussing numerous scenarios for the restructuring of SMC's operations, and SM Germany had access to SMC's books and records.  SM Germany advised SMC and gave it "direction and counsel" regarding SMC's business operations, which, because of SMC's financial situation, they "had no choice but to accept."

SMC ceased operations in June 2005.  On July 1, 2005, Frank Siekmann and SM Germany entered into an agreement with the newly formed Kitchen Interior Designs, Inc. ("KID"),[4] in which SMC's License was transferred to KID in return for KID's obligation to pay Frank Siekmann certain fees, and SM Germany agreed to act as the surety for KID's obligations under that agreement (the "2005 KID Agreement").

On November 22, 2006, SM Germany filed a complaint against SMC, Frank Siekmann, and another company owned by Frank Siekmann, Siematic Design Studios, LLC ("SDS").[5]  The complaint was amended on August 19, 2008.  On August 28, 2008, the defendants filed their

---

[4] SMC alleges that Kitchen Interior Designs, Inc. ("KID"), was an entity created by SM Germany to take over SMC operations.

[5] SDS is a Delaware limited liability corporation of which Frank Siekmann is the sole member.  SDS changed its name to TTPC Holdings, LLC in 2006.

First Amended Answer, Affirmative Defenses and Counterclaims (the "First Amended Answer") (Doc. #62). The First Amended Answer asserted a total of seven counterclaims against SM Germany and cross claims against Ulrich Siekmann as a third-party defendant:

- Count I: Breach of Contract (SMC v SM Germany);

- Count II: Breach of Contract (Frank Siekmann v SM Germany);

- Count III: Tortious Interference (SMC v SM Germany);

- Count IV : Tortious Interference (Frank Siekmann v SM Germany and Ulrich Siekmann);

- Count V: Breach of Fiduciary Duty (SMC v SM Germany);

- Count VI: Aiding and Abetting Breach of Fiduciary Duty (SMC v Ulrich Siekmann); and

- Count VII: Aiding and Abetting Breach of Tortious Interference (Frank Siekmann v. Ulrich Siekmann).

On September 19, 2008, SM Germany filed a motion to dismiss the defendants' counterclaim counts III through V and moved for partial summary judgment on count I and count II of the counterclaims (Doc. #67). Ulrich Siekmann filed his own motion to dismiss counts III, IV, VI and VII of the counterclaims (Doc. #76). On April 29, 2009, I issued a Memorandum (Doc. #125) and Order (Doc.#126) which granted summary judgment on paragraph 34 of counterclaim count I, and dismissed counterclaim counts II, V and VI.. Counts V and VI for breach of fiduciary duty were dismissed without prejudice. Counts III and IV alleging tortious interference and aiding and abetting tortious interference were not dismissed.

On May 13, 2009, SMC filed a Second Amended Answer, Affirmative Defenses, and Counterclaims, (the "Second Amended Counterclaims") (Doc. #129) asserting a total of six counterclaims, including repleaded claims for breach of fiduciary duty and aiding and abetting

breach of fiduciary duty:[6]

- Count I: Breach of Contract (SMC v SM Germany);

- Count III: Tortious Interference (SMC v SM Germany and Ulrich Siekmann);

- Count IV : Tortious Interference (Frank Siekmann v SM Germany and Ulrich Siekmann);

- Count V: Breach of Fiduciary Duty (SMC v SM Germany);

- Count VI: Aiding and Abetting Breach of Fiduciary Duty (SMC v Ulrich Siekmann); and

- Count VII: Aiding and Abetting Breach of Tortious Interference (Frank Siekmann v. Ulrich Siekmann).

On June 1, 2009, SM Germany and third-party defendant Ulrich Siekmann filed a joint motion to dismiss Counts V and VI of SMC's Second Amended Answer, Affirmative Defenses, and Counterclaims (Doc. #132). For the following reasons, I find that SMC's amended counterclaims do not state a claim for breach of fiduciary duty or aiding or abetting a breach of fiduciary duty, and these claims will be dismissed with prejudice.[7]

## II.     Legal Standard Motion to Dismiss

The moving parties challenge the legal sufficiency of the allegations in the counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), the claimant must "set forth sufficient information to outline the elements of his [or

---

[6] Although only six counterclaims remain, they have retained their original numbering from the First Amended Counterclaims which included seven counts.

[7] SM Germany and Ulrich Siekmann incorporate by reference their Motion for Summary Judgment on SMC's Counterclaims, filed on January 30, 2009 (Doc. #102), and argue that even if SMC's counterclaims for breach of fiduciary duty are not dismissed for failure to state a claim, they should be dismissed on summary judgment. Because there are grounds to dismiss counts V and VI pursuant to Fed. R. Civ. P. 12(b)(6), I do not reach the arguments sets forth in the motion for summary judgment here, but will address this motion in a separate order.

her] claim or to permit inferences to be drawn that these elements exist." Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). This means that the plaintiff must make factual allegations sufficient to "raise a right to relief above the speculative level," which requires more than "a formulaic recitation of the elements of a cause of action." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A pleading that merely offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, — U.S. —, 129 S.Ct. 1937, 1949 (quoting Twombly, 550 U.S. at 555). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement" Iqbal, 129 S.Ct. at 1949 (internal citations omitted). In deciding a motion to dismiss counterclaims, the court must "accept as true all allegations in the [counterclaims] and all reasonable inferences that can be drawn therefrom." Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). However, these reasonable inferences must be drawn from "factual content that allows the court to [infer] that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statement, do not suffice." Id.; see also Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007) (holding that a court is not bound to accept "unsupported conclusion and unwarranted inferences") (internal citations omitted). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S.Ct. at 1950.

### III.    Discussion

In its First Amended Counterclaims, SMC claimed that SM Germany breached its fiduciary duties to SMC by engaging in tortious interference. In my memorandum and order

dated April 29, 2009, I dismissed SMC's claim for breach of fiduciary duty because SMC did not allege facts necessary to establish that the parties shared a fiduciary or confidential relationship, the foundation of a cognizable breach of fiduciary duty claim. SMC fares no better in its Second Amended Counterclaims.

**1.      Motion to Dismiss Count V: Breach of Fiduciary Duty (SMC v. SM Germany)**

In order to state a claim for breach of fiduciary duty, SMC must allege: (1) the existence of a confidential relationship; (2) the defendant's failure to act in good faith and solely for the benefit of the plaintiff with respect to matters within the scope of the confidential or fiduciary relationship; and (3) an injury to the plaintiff proximately caused by the defendant's failure to act. Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392, 414-15 (E.D. Pa. 2006). A fiduciary duty exists when there is a "special relationship," which is one "involving confidentiality, the repose of special trust or fiduciary responsibilities." eToll, Inc., v. Elias/Savion Advertising, Inc., 811 A.2d 10, 22 (Pa. Super. 2002). A confidential relationship "generally involves a situation where by virtue of the respective strength and weakness of the parties, one has the power to take advantage of or exercise undue influence over the other." Id. In the business context, a confidential relationship is formed "only if one party surrenders substantial control over some portion of his affairs to the other." In re Scott's Estate, 316 A.2d 883, 886 (Pa. 1974). A business relationship between two parties to a commercial contract dealing at arms length does not create a "special relationship" under Pennsylvania law. Freedom Properties, L.P. v. Lansdale Warehouse Co. Inc., No. 06-5469, 2007 WL 2254422, at * 6 (E.D. Pa. Aug. 2, 2007).

SMC's amended claim alleges that, although SMC and SM Germany were separate

companies, SMC trusted SM Germany because of the family relationship between the two company heads, and that Ulrich Siekmann allegedly took advantage of this trust for his own selfish and nefarious purposes.  SMC also alleges that this trust, and SMC's dire financial need, created a situation where SM Germany had the power to put SMC out of business and to dictate terms to SMC or coerce SMC into doing whatever SM Germany wanted– a situation that led SMC to cede to SM Germany "unusual control" over SMC's operations.  As an example of this control, SMC claims it signed the 2005 Sales Agency Agreement, which "SMC would have preferred not to sign," under pressure from SM Germany.  (Second Am. Compl. ¶ 115.)   As another example of SM Germany's involvement with SMC's business affairs, SMC describes how SM Germany, through Ulrich Siekmann, discussed with SMC numerous scenarios for the restructuring of SMC's operations, and gave SMC advice and counsel regarding SMC's business operations.  SMC alleges that he had no choice but to accept SMC's counsel because of SM Germany's financial dominance over SMC.  SMC alleges that these circumstances established a fiduciary relationship, which SM Germany breached by engaging in tortious activities designed to destroy SMC's customer base and business.

     Even if these allegations are taken as true, they do not plausibly give rise to an entitlement to relief for breach of a fiduciary duty.  Although SMC alleges that the relationship between Frank and Ulrich Siekmann created a situation of trust and reliance, the existence of a family tie by itself does not create a fiduciary relationship.  A familial relationship "is merely one factor to be considered in the determination" of whether a confidential relationship existed. Rebidas v. Murasko, 677 A.2d 331, 334 (Pa. Super. 1996).  Even assuming the blood ties between the Ulrich brothers led Frank Siekmann to trust his half-brother, the balance of SMC's

amended allegations do not allege the kind of relationship required to support a claim for breach of fiduciary duty in the business context. SMC alleges that because it was in financial straights and depended upon SM Germany's shipment of products, it ceded "unusual control" to SM Germany. This allegation, however, is a legal conclusion couched as a factual allegation. SMC does not identify with any particularity any facet of its business that it actually ceded any control over to SM Germany. In fact, SMC admits that SM Germany and SMC are separately owned and controlled, and have been for at least ten years. (Second. Am. Compl. ¶¶ 99; 24).

SMC also claims that SM Germany allegedly provided advice and counsel on its business affairs, and that SMC felt obligated to follow it because of their weaker financial position. However, the taking and receiving of business advice does not generally create a fiduciary relationship in the business context. See Basille v. H& R Block, Inc., 777 A2d 95, 102 (Pa. Super. 2001) (recognizing that giving business advice may engender confidential relations *only* where the advisor represents himself to be an expert and the receiver "invest[s] such a level of trust that they seek no other counsel") (emphasis added); eToll, 811 A.2d at 23 (holding no fiduciary duty created by a commercial contract for professional services, even where one party relies on the other party's skill or expertise). There is no allegation that SM Germany purported to be an expert on SMC's business affairs, or that SMC sought SM Germany's counsel to the exclusion of all others. SMC's alleged feeling of obligation, or their financially weaker position, does not create any special duty on the part of SM Germany with respect to their business dealings.

Likewise, the allegation that SM Germany had the ability to shut down SMC by halting or delaying product shipments does not demonstrate the disparity of power necessary to form a

9

special relationship between a supplier and a vendor. "That a market is dependent on a supplier timely to furnish it with product does not render the relationship between them 'special.'" Valley Forge Convention & Visitors Bureau v. Visitor's Services, Inc., 28 F. Supp. 2d 947 (E.D. Pa. 1998) (holding that a retailer who contracted with a direct mail firm to ensure the delivery of Christmas catalogues "does not create a 'special relationship' although much of the retailer's annual profit may depend on the direct mail firm's performance"). That fact that SM Germany was the financially dominant contracting agent does not create a fiduciary duty between these two business entities. See GMC Franchising, Inc. v. O'Brien, 443 F. Supp.2d 737 (W.D. Pa. 2006)(holding that the "mere presence of unequal bargaining power and one-sided contract terms is insufficient" to establish a fiduciary duty between franchiser and franchisee who dealt at arms length).

Similarly, SMC's allegation that it entered the 2005 Sales Agency Agreement under pressure from SM Germany, even if true, is insufficient to sustain a claim for breach of fiduciary duty. SMC acknowledged that it entered into the 2005 Sales Agency Agreement "in an attempt to salvage its business." (Second Am. Compl. ¶ 12.) There is no allegation that this decision was not one SMC made independently, nor is there any allegation that this agreement was not negotiated at arm's length. There is a "crucial distinction between surrendering control of one's affairs to a fiduciary or confidant or party in a position to exercise undue influence and entering an arms length commercial agreement, however important its performance may be to the success of one's business." See Valley Forge Convention & Visitors Bureau v. Visitor's Services, Inc., 28 F. Supp. 2d. 947 (E.D. Pa. 1998). While the 2005 Sales Agency Agreement may have contained some terms that SMC was not happy with, this fact does not warrant the inference that

it was not an arm's length transaction, or that SM Germany exerted undue influence on SMC.

In short, the defendant's amended allegations still fail to allege facts that would allow the court to infer that the defendant is entitled to relief for a breach of fiduciary duty and this claim is dismissed with prejudice.

**2.     Motion to Dismiss Counterclaim VI: Aiding and Abetting Breach of Fiduciary Duty (SMC v. Ulrich Siekmann)**

Because SMC has failed to state a claim for breach of fiduciary duty against SM Germany, the claim of aiding and abetting a breach of fiduciary duty against Ulrich Siekmann must likewise fail.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

8/12/2009

Copies **VIA ECF** on _____ to:            Copies **MAILED** on _____ to: